IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID EUGENE MUNDAY,
                       Petitioner,

v.                                           Civil Action No. 5:12-cv-135


DAVID BALLARD, Warden
                       Respondent.


## REPORT & RECOMMENDATION

### *I. INTRODUCTION*

On September 12, 2012, David Eugene Munday, Petitioner, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, wherein he challenges his state conviction in Berkeley County, West Virginia, as unconstitutional. On October 29, 2012, the Court ordered Respondent to show cause why the petition should not be granted. Respondent did so by filing a motion for summary judgment on January 25, 2013. The Court then issued a *Roseboro*[1] notice informing Petitioner of his right to file responsive materials. Petitioner timely responded so the motion is now ripe for this Court's review.

### *A. Background*

On a rainy afternoon in October 2002, Petitioner got off early from his job as a carpenter. Upon returning to the trailer park where he lived with his girlfriend Connie Harrison, he asked Ms. Harrison to go to a local pub. She declined, so Petitioner went to the pub alone to get something to eat and have a few beers. Later that day, approaching evening, and after drinking and playing pool with Ms.

---

[1] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975.)

Harrison's estranged husband, Petitioner returned home. Ms. Harrison confronted Petitioner about staying at the bar for so long and he allegedly slapped her across the face.[2] Shortly thereafter, the next-door neighbors, Sandy and Johnny Lambert, came over to have a few drinks.

After the Lamberts came over the men and women separated. Petitioner and Mr. Lambert began drinking together, while Ms. Harrison and Ms. Lambert drove down to a gas station to get a soda. During this trip to the gas station, Ms. Harrison told Ms. Lambert about the alleged domestic violence that occurred earlier that evening. The women then called 911 to report the incident. While waiting for the police to show up, Ms. Lambert called Petitioner's home and asked to speak to her husband to alert him to the fact that officers were on the way. Petitioner refused to let her speak with her husband, so she called her house and asked her then fourteen-year-old daughter, Megan Boyce, to go next door and get Mr. Lambert out. Megan went next door and told her stepfather that he had a phone call and he needed to come back home. The two then left, leaving Petitioner home alone.

Two West Virginia State Troopers, Bobby Elswick and Robert Copson, responded to the 911 call and met the two women at the gas station. The troopers then followed Ms. Harrison and Ms. Lambert back to the trailer park to investigate. Upon arriving at the homes, the troopers learned two things. First, Petitioner was missing, presumably hiding in the heavily wooded area surrounding the homes. Second, Ms. Harrison's .22 caliber rifle was also missing. After looking for Petitioner without success, the officers advised Ms. Harrison to stay with the Lamberts, to lock

---

[2] Petitioner was found not guilty of the sole count of domestic battery in the indictment.

the doors, and to call if there was any more trouble. Ms. Harrison ignored this command and left the trailer park to stay with some family, and, luckily for her, avoided the chaos that would ensue.

After the troopers and Ms. Harrison left the trailer park, Petitioner returned with the missing rifle. The Lambert family saw Petitioner approaching their residence so they locked the doors. The weak trailer park door was no match for Petitioner's anger, however, because he easily kicked the door off the hinges, screaming obscenities and threating to kill the family for interfering with his relationship. It is not exactly clear what happened in the trailer that night because the Lamberts and Ms. Boyce gave conflicting testimony at trial, but Petitioner chased Ms. Lambert out of the trailer when she fled and fired a shot, missing his target. Meanwhile, Mr. Lambert was able to sneak his stepdaughter out the back door. Ms. Lambert and her daughter wound up at two different residences where they sought refuge, and each initiated another 911 call. During those hectic calls, Ms. Lambert and Ms. Boyce tried to piece together what was happening, and relayed to the authorities that Mr. Lambert remained a hostage.

Troopers Copson and Elswick, who were already familiar with the trailer park from their earlier visit to the scene, again responded. This time, however, the situation was different because not only was it dark outside, but also they were under the impression that a hostage crisis was unfolding. So the troopers stealthily arrived at the end of the dark winding lane that leads up to the trailer park and they waited. They needed backup before they approached the scene. Two more West

Virginia State Troopers, Eric Burnett and John Droppleman, eventually arrived to assist Copson and Elswick.

While Troopers Copson and Elswick were waiting on the backup, more chaos was unfolding up that lane. After hanging up with the 911 operators, Ms. Boyce, who again was barely a teenager, left the safety of the home she was staying in to attempt a rescue mission for her stepfather. Armed with two butcher knives, she went towards her trailer where she believed her father was still being held hostage. She stopped short of the trailer, ducking behind a red pickup truck that belonged to her stepfather's brother, who had also arrived at the trailer park with his two sons; the brother and his sons did not want to get involved and were already hiding in the woods. Ms. Boyce abandoned her rescue attempt, but eventually met up with her father, who was now free from Petitioner, and the two hid as well. Petitioner was now watching the troopers coming up the lane through the scope on his rifle.

The four troopers devised a plan to approach the trailer park; two armed with their .40 caliber service revolvers, the other two carrying twelve gauge shotguns. They broke up into two groups, with Elswick and Copson flanking one side of the lane, and Droppleman and Burnett on the other side working their way through the wooded edge of the road. The troopers all remained within speaking distance of each other, and eventually met up and broke into different groups, this time Droppleman and Copson going together, and Elswick and Burnett going together. After this shift, they all noticed a silhouetted figure down the dark road. The troopers lit their flashlights and noticed that the person down the road was carrying a weapon. The troopers then identified themselves as officers and ordered

Petitioner to drop the gun. Petitioner responded with threatening language and one shot was fired.[3] The officers responded with gunfire and Petitioner retreated into the woods taking one shotgun blast to the leg during the retreat.

Troopers Droppleman and Copson pursued Petitioner into the woods. When Petitioner made a move from one tree cover to another, Droppleman hit him with another shotgun blast to the arm, this time dropping him for long enough to allow the troopers to de-arm and arrest him. Trooper Burnett did not engage in the chase because he heard a gurgling sound coming from beside him. Trooper Elswick had been shot in the head.

Petitioner was taken by ambulance to the hospital so that he could be treated for the gunshot wounds he received. Before he was taken, during the trip to the hospital, and at the hospital, he made several incriminating statements. Moreover, during his pre-trial detention, he made incriminating statements to a nurse and correctional officer that were introduced at trial. Among those statements was that he shot the officer because he wanted the police to kill him that night—cop assisted suicide he called it. The trooper, who according to doctors was not going to live, did survive the shooting. A West Virginia grand jury returned a twenty-eight count indictment charging Petitioner with, among other things, kidnaping and four counts of attempted murder.[4]

---

[3] Petitioner maintained during trial that he never fired the shot, and counsel for Petitioner put forward an argument that Sandy Lambert fired the shot that hit the trooper. This argument was based on the police reports made after the fact where none of the officers stated that Petitioner fired his weapon, and from a 911 call from Sandy Lambert, where she said that she fired a gun that night; when she testified at trial she said she did not fire a gun.

[4] Petitioner was found guilty of three counts of burglary, five counts of wanton endangerment, one count of unlawful assault on a police officer, four counts of attempted murder in the second degree,

***B. State Proceedings***

Prior to trial, Petitioner's counsel submitted several motions to dismiss, a motion to suppress evidence, and a motion for a bill of particulars. The trial court denied all motions except for a motion to dismiss Count 12 of the indictment, which the state conceded was a lesser included of another count. The trial in this matter lasted seven days, which included a jury view of the crime scene. The defense submitted to the jury the opinions of several mental health experts to support its position that Petitioner lacked the intent, either through mental illness or intoxication, to commit the crimes charged. Moreover, the defense vigorously cross examined the state's witnesses to support this position, and to try to impress a reasonable doubt that Petitioner even fired his gun that evening. In the midst of the trial, two more counts of the indictment were dismissed as lesser included offenses of other counts.

Following the seven day trial, Petitioner was found guilty on all counts submitted to the jury except for the kidnaping charges, and the sole charge of domestic battery. The defense made several post-verdict motions, including one that Petitioner was never identified by a witness, all of which were denied. Subsequent to the verdict, a second trial was held to determine if the State could invoke its three strikes rule, which would mean a possible life sentence for Petitioner. The State was successful at this trial, showing two previous Maryland convictions that were eligible under the state's recidivist statute. Petitioner was eventually sentenced to

---

two counts of brandishing a firearm, three counts of discharging a firearm within 500 feet of a dwelling, one count of destruction of property, one count of assault, and one count of fleeing from police.

seven to fifty-seven years in the penitentiary, followed by a consecutive sentence of fifteen years to life in prison; the latter sentence was the result of the recidivist enhancement.

Petitioner then made a direct appeal to the West Virginia Supreme Court of Appeals, which was refused by that Court on November 30, 2004. He then filed a petition for a writ of habeas corpus in state Court. On March 3, 2011, the state court denied relief on all counts but one, and requested additional briefing on that one count that involved the application of the recidivist statute. On July 20, 2011, and after further briefing on that ground, the state court issued a final order denying relief. Petitioner then appealed to the West Virginia Supreme Court, which denied relief on June 25, 2012. The instant petition timely followed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In viewing the motion for summary judgment, the Court must do so under the constraints imposed by the habeas statue. Under § 2254, this Court may not

grant federal habeas relief unless it concludes that West Virginia's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362 (2000). A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 405. A state court decision "involves an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412. An objectively "unreasonable application of federal law is different from an incorrect or erroneous application of federal law." *Id.* Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable" for habeas relief to be granted. *Id.* at 411.

As these principles make clear, § 2254(d) imposes a powerful limit on the relitigation of claims that have already been rejected by state courts:

> [Section 2254(d)] preserves authority to issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no

farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.

*Harrington v. Richter*, 131 S.Ct. 770, 786–87 (2011). A habeas petitioner proceeding under § 2254 bears the burden of showing that he is entitled to habeas relief under this highly deferential standard.

Finally, determinations of factual issues by the state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This standard "reflects Congress's view that there is no reason for a do-over in federal court when it comes to facts already resolved by state tribunals." *Id*. Accordingly, courts should not "casually cast aside a state court's factual findings. *Id*.

### III. DISCUSSION

Because Petitioner has raised so many grounds for relief, twenty in all, the Court will address them in the numerical fashion that Petitioner has presented them, even though some of the claims overlap in subject matter and the constitutional question raised.

*1. Bill of Particulars*

Petitioner argues that the trial court erred by denying his motion for a bill of particulars, and, as a result, he was unable to properly prepare a defense to the charges. The state habeas court found that the indictment sufficiently stated the charges against him, and that additional discovery was provided for each charge, which gave Petitioner ample opportunity to understand those charges and develop a defense. The Court finds that this is not contrary to, or an unreasonable application of, any clearly established federal law. In fact, a defendant has no constitutional right to a bill of particulars. *See Powell v. Kelly*, 562 F.3d 656 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1281 (2010). Accordingly, no relief can be granted on this ground.

*2. Sufficiency of the Indictment*

Here, Petitioner complains that the trial court erred by not dismissing the indictment because it did not fully inform him of the conduct for which he was charged. The state habeas court, citing the West Virginia Constitution and rules of criminal procedure, found that the indictment was sufficient. Specifically, it found that the incidents in question were sufficiently laid out so that there was no confusion as to what crimes were being charged, and no future possibility of issues that related to double jeopardy.

It is clearly established federal law that an indictment is sufficient under the United States Constitution if it, "first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

Furthermore, the sufficiency of a state charging instrument "is not a matter for federal habeas corpus relief unless the indictment is so defective that the convicting court had no jurisdiction." *See e.g. Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994), *cert. denied*, 512 U.S. 1289 (1994); *DeBenedictis v. Wainwright*, 674 F.2d 841, 842 (11th Cir. 1982). To show this, the indictment must be "so fatally defective that under no circumstances could a valid conviction result from facts provable under the indictment." *Johnson v. Estelle*, 704 F.2d 232, 236 (5th Cir. 1983).

After reviewing the indictment, the Court finds that the indictment was not so fatally defective. Moreover, the state court's decision was not contrary to, or an unreasonable application of, the standard announced by the Supreme Court in *Hamling*. In fact, the state court found that the indictment contained exactly what *Hamling* requires. Accordingly, no relief can be granted on this ground.

*3. Count 28 of the Indictment*

Petitioner's ground three argues that the trial court erred by submitting Count 28 of the indictment, brandishing, to the jury because it was a lesser included offense within the definition of wanton endangerment. In support, Petitioner relies on a West Virginia Supreme Court of Appeals case that construed a West Virginia criminal statute.

Section 2254 unambiguously provides that "it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Wilson v. Corcoran*, 131 S.Ct. 13, 16 (2010) (emphasis in original). As such, the United States Supreme Court has "repeatedly held that federal habeas corpus relief does not lie for errors of state law." Id. (internal quotations and

citation omitted). *See also Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011). Accordingly, this Court may not review Petitioner's argument that brandishing is a lesser included offense of wanton endangerment as determined by that state's highest court. Moreover, a brief review of those two counts of the indictment clearly shows that the counts refer to two separate incidents. Thus, no relief can be granted on this ground.

*4. Count 25 of the Indictment*

In this count, Petitioner argues that Count 25 of the indictment, assault on Johnny Lambert, should not have been submitted to the jury because the testimony at trial made it unclear what conduct constituted the assault. Further, Petitioner argues that it would have been impossible to have committed the brandishing, wanton endangerment, and kidnaping charges against Mr. Lambert without committing an assault. Although the claim was raised in the state proceedings, no reasoning for the denial of this count was given. This Court views this claim as a challenge to the sufficiency of the evidence.

It is clearly established law that a federal habeas court sitting in review of a state court conviction may entertain a sufficiency of the evidence claim. *See Jackson v. Virginia*, 443 U.S. 307 (1979). To be successful in this claim, Petitioner would have to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id*. at 319. Here, the state put Mr. Lambert on the stand, and he testified that Petitioner knocked him over and broke his foot. Thus, the jury

certainly had evidence before it to support its verdict that an assault upon Mr. Lambert was committed. Accordingly, no relief can be granted on this ground.

*5. Attempted Murder Counts*

Petitioner argues that the trial court should have dismissed the attempted murder counts in the indictment because they did not allege that the attempted murder was performed with malice, which is an essential element of murder under West Virginia law. Again, the state habeas court did not specifically address this issue, finding only generally that the indictment was sufficient. For the reasons stated previously, this Court finds that the state's decision to find the indictment sufficient is not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, no relief can be granted on this ground.

*6. Four Counts of Attempted Murder with One Bullet*

Here, Petitioner argues that the trial court erred by not dismissing, or granting a verdict of acquittal, on three of the four counts of attempted murder because only one shot was fired at the officers. In securing the conviction on these four counts, the state relied on the West Virginia doctrine of transferred intent. Again, the state court did not address this issue in its order denying habeas relief. Petitioner has not advanced, nor is the Court aware of, any clearly established federal law as determined by the United States Supreme Court to support this four counts, one bullet, theory. In fact, Petitioner only presents a state law case decided by West Virginia's Supreme Court of Appeals. However, that court has already passed on the claim as presented, which is an interpretation of its law, and as discussed in Ground 3, this state law claim is not cognizable under 2254 review.

*7. Double Jeopardy*

Petitioner claims that his convictions for wanton endangerment precluded convictions for attempted murder because of the elements of the crimes are the same; thus he being placed in double jeopardy by being convicted of separate crimes for one act. The state habeas court did not give any reasoning for the denial of this claim. Inherent in this Fifth Amendment protection is the assurance "that the [sentencing] court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). The seminal case in Supreme Court jurisprudence to introduce a test used to determine whether a sentencing court has run afoul of this right is *Blockburger v. United States*, 284 U.S. 299 (1932). The *Blockburger* test, simply stated is "whether each of the two offenses requires proof of a different element. If each requires proof of a different element, then an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Manokey v. Waters*, 390 F.3d 767, 772 (4th Cir. 2004).

Here, Petitioner claims that his convictions and sentences for attempted murder and wanton endangerment required proof of the same elements for the same action. West Virginia Code Section 61-7-12, the wanton endangerment statute, provides that "[a]ny person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of a felony." Further, Section 61-2-1, the state murder statute, provides that:

> Murder by poison, lying in wait, imprisonment, starving,
> or by any willful, deliberate and premeditated killing, or
> in the commission of, or attempt to commit, arson,
> kidnapping, sexual assault, robbery, burglary, breaking

and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

It is clear on the face of the statutes that the two require proof of different elements. Wanton endangerment requires proof of an act committed with a firearm which creates a substantial risk of death or serious bodily injury; not a requirement of proof under the murder statute. Similarly, the murder statute requires a showing of lying in wait, or willful, deliberate and premeditated killing, all of which were charged in the indictment; these elements are not required under the wanton endangerment statute. Accordingly, convictions under both statutes do not violate double jeopardy and no relief can be granted on this ground.

*8. The Statements*

Petitioner made several statements at the scene of the incident, during the trip to the hospital, at the hospital, and at the regional jail in the days following. He contends that the trial court should have suppressed all of these statements either as part of his Fifth Amendment protections, or because they were not timely turned over and the prejudicial effect of the statements outweighed the probative value. Petitioner breaks down the statements, and his arguments in support, by the location at which the statement was given. The state habeas court found no error, and found that the statements were voluntary. This Court finds that this is not contrary to, or an unreasonable application of, clearly established federal law.

Of course, as already discussed on several occasions, sitting as a federal habeas court applying § 2254, it is not for us to review a state court's evidentiary

rulings, *see Estelle v. McGuire*, 502 U.S. 62, 72 (1991), because those rulings ordinarily do not present federal constitutional questions. *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986); *see also Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001). The exception to this rule is if the evidentiary ruling unfairly prevented a defendant from presenting evidence critical to his defense. *Romano*, 239 F.3d at 1166 (citing, among others, *Green v. Georgia*, 410 U.S. 284 (1973)). Here, Petitioner was not denied the introduction of evidence critical to his defense. Thus, no relief can be granted on his evidentiary ruling contentions that the statements should have been excluded as prejudicial under West Virginia Rule of Evidence 403. Similarly, with regard to Petitioner's argument that some of the statements should have been provided earlier in discovery under West Virginia Rule of Criminal Procedure 16, that claim in not cognizable.

With regard to Fifth Amendment contentions, it is clearly established federal law that a suspect must be informed of certain constitutional rights before being subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Simply put, "[t]he *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2263 (2010). Police are not required to obtain a waiver before beginning interrogation. *Id.* at 2264. If a suspect does not invoke her rights, then the *Miranda* safeguards do not apply. If a suspect does invoke her right to remain silent, then the prophylactic rule of *Miranda* and its progeny kicks in. However, the *Miranda* safeguards only apply to custodial interrogation. *See e.g. Yarborough v.*

*Alvarado*, 541 U.S. 652 (2004). Thus, the suspect has to first be in custody, and there has to be an interrogation.

Further, whereas the Fifth Amendment protects against self-incrimination, it is clearly established federal law that the Fourteenth Amendment requires that statements are not obtained through force or intimidation. *See Brown v. Mississippi*, 297 U.S. 461 (1936). Statements obtained through these means can infect the fairness of the entire judicial proceeding. In determining voluntariness, the Court must look to the totality of the circumstances, taking into account factors such as the maturity, education, physical and mental condition of the defendant, and whether the defendant received *Miranda* warnings. *See Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Finally, if police misconduct is alleged, that misconduct does not rise to the level of a due process violation unless it "so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986). With this basic framework in mind, the Court will now turn to each set of statements.

As a threshold observation, Petitioner was advised of his *Miranda* rights immediately upon his capture, and he does not make the assertion that he invoked his right to remain silent. "In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 130 S. Ct. at 2264. This is clearly the case for the statement made at the scene when Petitioner stated that the officers could not prove he shot immediately after he was read his rights. Moreover, there is no contention that the statement was part of a coercive

act. Finally, although there was evidence introduced during trial that Petitioner lacked the mental capacity, or was too intoxicated that night, the state habeas court found that the statements were voluntary. This is not contrary to, or an unreasonable application of, clearly established federal law because the state courts used the totality of the circumstances, including the testimony of the witnesses and experts in the case, to determine that the statements were voluntary.

Second, Petitioner made several statements to the nurses and paramedics in the ambulance on the way to the hospital, in which he told them that he was watching the officers through the scope on his rifle, but that he did not fire a shot; he did not know why officers were shooting him. These statements were not made during any interrogation, and were not even made to law enforcement. Thus, no constitutional safeguards are implicated.

Upon arriving at the hospital, there was, as one would imagine with a police officer being shot, a heavy police presence. While being wheeled in to the emergency department on the stretcher, one of the supervising officers asked the medical personnel, "Is this the motherfucker that did it?" Petitioner responded, "I'm the motherfucker that did it!" The state habeas court found no constitutional infirmity in allowing the statement to go to the jury. While it is clear that Petitioner was in custody—he was arrested at scene and presumably handcuffed to the gurney—there was no interrogation.

Interrogation can take two forms, either direct interrogation, or its functional equivalence. The structure of the officer's statement shows that this was not direct interrogation. The officer asked if this was the person that shot the trooper, not "did

*you* shoot the trooper. The functional equivalence of interrogation is any statement "the police should know [is] likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1979). For example, in *Innis* two police officers were making statements about how horrible it would be if one of the handicapped girls at a nearby school found the gun they alleged that the suspect had hidden. The suspect then revealed the location of the gun. The Supreme Court found that this was not the functional equivalent of interrogation. Similarly here, the officer made a general statement loud enough for everyone in the room to hear, and it was not likely to elicit an incriminating response from Petitioner.

Lastly, Petitioner complains of the admission of several statements he made to a nurse and correctional officer at the regional jail where he was being held pending trial. Those statements relayed that Petitioner shot at the officer because he wanted to commit "cop-assisted suicide." Without belaboring the point, Petitioner made these statements without any questioning. In fact, the nurse and correctional officer told him to shut up, yet he continued to talk. In sum, none of the statements were submitted in violation of his constitutional rights.

*9. Recidivist Trial*

Petitioner was sentenced to life in prison based upon West Virginia's recidivist statute. In securing the sentence, West Virginia used the instant conviction, and two prior convictions from Maryland. Petitioner argues that those two Maryland convictions, although they carried a potential prison sentence, were misdemeanors. The state habeas court required further briefing on this issue, and eventually determined, in looking at West Virginia case law, that the state statute is

not driven by a felony/misdemeanor classification, or comparing the statutory law of the two states. Rather, it is more searching inquiry into the facts of the underlying conviction to determine how the crime would have been prosecuted in West Virginia. After making that searching inquiry, the state habeas court found that if the crimes were prosecuted in West Virginia there would have been confinement in the penitentiary. Thus, the two convictions qualified. The West Virginia Supreme Court adopted the habeas court's reasoning.

In essence, what Petitioner is asking this Court to do is tell West Virginia how to apply its recidivist statute. That is not within the purview of this Court's habeas review because, as mentioned above, "it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Wilson*, 131 S.Ct. at 16. Inasmuch as Petitioner claims that life sentence violated the Eighth and Fourteenth Amendments to the United States Constitution, those arguments must, too, fail.[5]

It is clear that the respective states of the union may enact harsher punishments than other states, including punishing a recidivist more harshly than a first time offender. *See e.g. Ewing v. California*, 538 U.S. 11 (2003). Thus, Petitioner's Fourteenth Amendment equal protection argument has no merit.

However, the United States Supreme Court's precedents on the Eighth Amendment "have not been a model of clarity." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). "[O]ne governing legal principle emerges as clearly established under §

---

[5] Petitioner also raises that the sentence would be improper under the Federal Sentencing Guidelines. However, that, too, is out of the scope of this Court's review because it is a West Virginia sentence, not a federal sentence.

2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." *Id*. Even the precise contours of this principle are unclear, though, and only apply in the "exceedingly rare and extreme case." *Id*. at 73 (internal quotations omitted). In *Lockyer*, the Supreme Court was faced with a California man sentenced to life in prison based on that state's three strikes rule, and the basis for the third conviction was stealing $150 in videotapes. The Court found, on 2254 review, that the sentence did not violate the Eighth Amendment. One factor the Court considered was that the life sentence in that case had an eligibility of parole.

Similarly here, Petitioner was sentenced to life on what this Court sees as much more egregious charges than that in *Lockyer*. Moreover, the life sentence contains an eligibility of parole. Thus, this is directly in line with the Supreme Court's precedents in this area. Accordingly, the Court finds that the state court's sentence of life in prison is not contrary to, or an unreasonable application of, clearly established federal law, and no relief can be granted.

*10. Sufficiency of the Evidence*

Similar to his argument in ground four, Petitioner claims that overall there was insufficient evidence to convict him of the charges. Specifically, Petitioner argues that the bullet was not removed from the officer's head, so it could not be proven beyond a reasonable doubt that the bullet came from his gun. Further, he claims that the bullet casing was not found until ten days after the incident, and that no witness identified him at trial. The state habeas court found that, under state law, Petitioner was facing a heavy burden because a jury verdict should only be set aside when the record contains no evidence from which a jury could find guilt beyond a

reasonable doubt, and that this was not the case in Petitioner's trial. The Court finds that this is not contrary to, or an unreasonable application of clearly established federal law.

As already mentioned above, it is clearly established federal law that to be successful in this claim, Petitioner would have to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson*, 443 at 319. The state of West Virginia presented a great deal of evidence to the jury, consuming three days of the seven day trial. That evidence included: testimony from mental health experts about Petitioner's ability to form the intent to commit the crimes charged; witnesses from the scene of the crime, including the Lamberts and the police officers; other witnesses that introduced statements made by Petitioner after the incident that October night; ballistics experts that testified only Petitioner's gun could have fired the bullets of the casings found at the scene; and crime scene experts that testified to the collection of the evidence, and the evidence found. Clearly then, the Court cannot say that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. It is equally clear that the jury took this case seriously, deliberating for three days before returning the verdict, which also found Petitioner not guilty on several counts. Accordingly, no relief can be granted.

*11. Prosecutor's Statement in Closing*

In her initial remarks in closing arguments at trial, the state's prosecutor insinuated that this case was personal to her as a member of the law enforcement

community. Petitioner argues that this was improper. The state habeas court found that this comment was not improper because the prosecutor was just relating "to the jury how she was connected to the case, a fact that most individuals probably already knew or could have picked up on during trial," and that the comment did not create a manifest injustice.

It is clearly established federal law that the relevant inquiry into this claim is "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Further, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned."[6] *Id.* The state court applied state law in finding that the prosecutor's statements were not improper, and this Court finds that this decision is not contrary to the clearly established due process standard enunciated above. In fact, the prosecutor's remarks do not even come close to those that did not violate due process in *Darden*.

---

[6] As a point of comparison, the *Darden* Court found that it was not a violation of due process when the prosecutor, among others, compared the defendant to an animal and tendered the following to the jury:

> "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun." "I wish someone had walked in the back door and blown his head off at that point." "He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself." "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time." "[D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat."

*Darden*, 477 U.S. at 180, n.12.

*12. Cruel and Unusual Punishment*

As discussed in detail in this Court's discussion of Petitioner's Ground 9, there is no Eighth Amendment violation for the life sentence imposed.

*13. Witness Identification*

Petitioner claims that not one single witness identified him at trial. The state habeas court did not opine on this issue. This Court views the claim as another sufficiency of the evidence claim; particularly, whether there was sufficient evidence presented that a reasonable jury could find that the man seated at defense table was the same David Eugene Munday that was charged in the indictment. Although no single witness pointed Petitioner during trial, saying "that's the man there," there was sufficient evidence presented that Petitioner was the man on trial facing the charges. In fact, during *voir dire*, the trial judge had Petitioner stand and face the jury after he read the indictment, and he introduced Petitioner to the jury as David E. Munday. Further, the trial was replete with reference to Mr. Munday by name, including some of the mental health experts who testified as to Petitioner's courtroom demeanor. Thus, the Court finds no merit in this claim.

*14. Motions for Directed Verdict*

Petitioner claims that the trial court erred in not granting his motions for a mistrial due to prejudicial statements made by the state's witnesses. All of these contentions are based either upon the West Virginia Rules of Evidence, or on interpretations of West Virginia law. As thoroughly discussed, because there is no federal constitutional question raised these questions are beyond the scope of review under 2254.

*15. Cumulative Error*

Because the Court finds no single error in the state court proceedings, it logically follows that there can be no cumulative error.

*16.* Sufficiency of the Evidence

Petitioner alleges that the state habeas court erred by denying his petition for a writ of habeas corpus because there was insufficient evidence to support the conviction. This is the same claim made in his Ground 10, and for the reasons stated by the Court in that Ground no relief can be granted.

*17. Ineffective Assistance of Counsel*

Petitioner contends that his counsel was ineffective for several reasons: (1) failure to hire a forensics or ballistics expert; (2) failure to request a state witness be given an independent psychological evaluation; (3) failure to strike jurors and present proper evidence at trial; (4) failure to properly investigate the case and present valid defenses; and (5) failure to adequately appeal.

When a petitioner brings an ineffective assistance of counsel claim, counsel's conduct is measured under the two-part analysis in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Deficient performance is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden, Maryland Corr. Adj. Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992).

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. In order to demonstrate prejudice, Petitioner must show that but for his attorney's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. Error by counsel which falls short of the constitutional ineffectiveness standard does not constitute cause, notwithstanding that the error may arise from inadvertence, ignorance, or strategic choice. *Murray v. Carrier*, 477 U.S. 478 (1986).

Moreover, as the Court has made clear, this review is done through the lens of § 2254, as modified by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). In looking at ineffective assistance claims through this lens,

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal citation omitted). Congress intended for AEDPA to raise the bar for relief in a 2254 case because it deals with claims that have already been litigated in state court. *Id*. at 786.

Accordingly, "even a strong case for relief does not mean that state court's contrary conclusion was unreasonable. *Id*. (citing *Lockyer*, 538 U.S. at 71).

The state habeas court found that defense counsel did hire an expert, but that the defense made a strategic choice not to present the expert. Further, the state court found that is was pure speculation as to the effect this expert would have had on the jury's deliberations. The Court finds that this is not contrary to, or an unreasonable application of *Strickland*. It is well settled that courts should not hastily second guess the tactical decisions made by counsel during the pendency of a trial because the lawyers have first hand knowledge of the facts, the witnesses, and information outside the record on review. *See e.g. Strickland*, 466 U.S. at 691; *Bobby v. Van Hook*, 558 U.S. 4 (2009). Even if Petitioner shows that the testimony "could support [his] defense, it would be reasonable to conclude that a competent attorney might elect not to use it. *Harrington*, 131 S. Ct. at 789. Accordingly, this claim must fail.

Petitioner's next argument is that his counsel should have moved to have an independent psych evaluation done on Sandy Lambert. The state habeas court found that there was no evidence that Sandy Lambert was incompetent to testify, and that counsel's cross-examination of Ms. Lambert fully exposed all the inconsistencies in her story. This is not an unreasonable application of *Strickland*. The state court found Petitioner's third argument too vague because it does not specify what evidence he wanted introduced, or why jurors should have been stricken. This Court agrees. Without specifying what the evidence or bias was, the Court has no way to determine if any prejudice resulted from the alleged deficient performance.

Petitioner's fourth argument against his counsel is that they did not investigate his allegations that "many conspiracies were entered into on and around October 10, 2002." He further "speculates that Sandra Lambert, John Lambert and Megan Boyce conspired with one another to cover up their murderous and intoxicated behavior on the night in question." Finally, he "speculates that the West Virginia State Police may have altered their story to cover up real events." The state habeas court did not speak on this argument, only on Petitioner's contention that a mental health defense was not pursued; a contention not raised in the instant petition. Again, using Petitioner's language, it is pure speculation that there was a conspiracy against him, and he has failed to show how the outcome would have been different if a private investigator testified. Surely a private investigator was used in this case, but counsel made the strategic choice to not have that investigator testify. Further, there was ample opportunity, which defense counsel took advantage of, to cross-examine the witnesses and perpetrators of the alleged conspiracy. There is nothing deficient about this performance.

Petitioner's final ineffective assistance ground is that appellate counsel failed to properly assert a sufficiency of the evidence argument on appeal. As respondent notes, ground (j) of the direct appeal states that the "Circuit Court erred by not dismissing, and by not granting a verdict of acquittal on all counts, as the *evidence failed to support the convictions*." (*See* Resp't Ex. 6.) Thus, there is no merit to the claim because the ground was raised on appeal. In sum, the state court's application of the *Strickland* standard was not unreasonable.

*18. Jury Selection*

In this ground, Petitioner claims that four of the sitting jurors in his criminal trial should have been stricken for the following grounds: (1) Rochelle Lushbaugh because her aunt is a correctional officer; (2) Angela Gesford because she worked with Trooper Elswick's wife for a year in the past; (3) Roy Butts because he turned his son in to police for allegedly uttering checks; and (4) Melanie Earehart because she worked in a law firm that represented the West Virginia State Police in a civil capacity. Further, Petitioner claims the following jurors should have been stricken from his recidivist trial: (1) Harry Chaney because his brother is a correctional officer; and (2) Sharon Cox because she heard on the news that a trooper had been shot. Finally, Petitioner argues that the jury was selected in a sequential alphabetical order, and that the West Virginia Supreme Court of Appeals had previously issued an order prohibiting selecting jurors in this fashion. With respect to this last ground, that is clearly an issue of state law that the state's highest court has passed upon, and is not reviewable under 2254.

The state habeas court found that the trial court and lawyers made full inquiry into all of the questioned jurors, especially the former co-worker of the wounded trooper's wife. All of the inquiry led the trial court to believe, as the potential jurors averred, that they could be impartial and deliver a fair verdict based upon the evidence. Further, the state habeas court found that Petitioner could show no prejudice.

It is clear that the United States Constitution provides that every defendant has the right to trial by an impartial jury. *See e.g.*, *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). To satisfy this mandate of impartiality, a juror must be able to "lay aside

his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Further, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). What due process does not require is "a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Id*. Importantly, because this is a federal habeas action, the state court's findings are "presumptively correct." *Id*.

The state court's finding that the jury was impartial is not unreasonable, or contrary to the federal law outlined above. The Court empaneled a potential pool of 122 people, *voir dire* lasted an entire day, and of the witnesses complained of the trial court took extra caution to question those witnesses and received assurance from those jurors that they could impartially decide the case based on the evidence presented at trial. It further appears that the jury carried through on this promise because it took them three days to deliver the verdict, which also included findings of not guilty on several counts. Accordingly, the Petitioner can find no relief on this ground.

*19. False/Unreliable Testimony*

In this claim, Petitioner asserts that his conviction was based on false or unreliable testimony. The state habeas court found that it was the jury's job to assess credibility and to give weight to the statements. Although there certainly was some inconsistency in the testimony presented, a constitutional question is only raised when the "prosecution knew, or should have known," of any false testimony.

*United States v. Agurs*, 427 U.S. 97, 103 (1976). There is no insinuation that the state knowingly introduced perjured testimony. As far as the inconsistencies in the statements went, counsel for defense vigorously cross-examined these witnesses to bring the inconsistencies to the jury. It was then the jury's job to believe or disbelieve the testimony, and the state court's determination is not contrary to, or an unreasonable application of, any clearly established federal law.

*20. Change of Venue*

Petitioner argues that the trial court should have granted his motion for a change of venue of the notoriety of the case, and because testimony was presented at the hearing on the motion that between 240-260 jurors would have to be empaneled in order to seat a proper jury; only 122 potential jurors were called. The state habeas court found that the trial court's decision to deny this motion was not clearly wrong because 122 jurors were called, far more than the typical case, which showed that the court took the issue into consideration. Moreover, the court found that each potential juror was screened on their knowledge of the case and their ability to hear the evidence and decide the case in an unbiased and non-prejudicial manner.

As previously mentioned, it is well established federal law that the Fourteenth Amendment protects a defendant's Sixth Amendment right to trial by an impartial jury, and a defendant may request a "transfer of the proceeding to a different district . . . if extraordinary local prejudice will prevent a fair trial—a basic requirement of due process." Skilling v. United States, 130 S. Ct. 2896, 2912-13 (2010) (internal quotations omitted). "It is not required, however, that the jurors be

totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). The determining test is based upon a totality of the circumstances which must show that the trial was fundamentally unfair. *Id.* at 723.

In the instant case the state habeas court was satisfied that a jury pool substantially larger than in a typical case was convened, and that each juror was questioned on the knowledge of the case and their ability to render a fair verdict based upon the evidence. This decision is not contrary to, or an unreasonable application of the Supreme Court precedent outlined above. This Court will further note that *voir dire* in the case took an entire day which further shows the state court's dedication to empaneling an impartial jury. Accordingly, no relief can be granted on this ground.

## *IV. CONCLUSION & RECOMMENDATION*

The Court finds that the state decision in Petitioner's case was not contrary to, or an unreasonable application of, clearly established federal law. Further, the state court did not base its decision on an unreasonable application of the facts. Thus, Petitioner is not entitled to habeas relief under § 2254. Accordingly, the undersigned recommends that Respondent's Motion for Summary Judgment (Doc. 29) be **GRANTED** and the habeas petition be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen [14] days of the filing of this recommendation, file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such

objections. A copy of any objections shall also be submitted to the United States District Judge of record. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985): United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the pro se plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to any counsel of record, as applicable.

DATED: 3-22-2013



DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE